UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOYCE TRICE,<br><br>      Plaintiff,<br><br>   v.<br><br>DETECTIVE ROGELIO LARA, DETECTIVE MAJDI SHALABI, and LADONNA HUDSON,<br><br>      Defendants. | No. 15 CV 1203<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

A disturbance involving defendant LaDonna Hudson broke out at an Aldi's Food Market, where plaintiff Joyce Trice was working as a security guard. Trice believes that Hudson conspired with defendants Detective Rogelio Lara and Detective Majdi Shalabi of the Chicago Police Department to have her falsely arrested. [17] at 7. Trice brings an action for false arrest against defendants Lara and Shalabi, and an action for conspiracy under 42 U.S.C. § 1983 against defendants Lara, Shalabi, and Hudson. Defendants Lara and Shalabi filed a joint motion for summary judgment of Trice's claims against them; and defendant Hudson filed a separate motion for summary judgment of Trice's claim against her. Both motions for summary judgment are granted.

**I. Background**

The court construes all facts and reasonable inferences in the light most favorable to Trice. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). Under Local Rule 56.1, statements of fact must be supported by

admissible evidence to be admitted. Such statements by the moving party, here, the defendants, will be deemed admitted unless they are properly controverted by a statement of the opposing party, Trice.

On December 6, 2012, Hudson went grocery shopping at Aldi's Food Market on Cottage Grove Avenue in Chicago, Illinois. [55] at 2, ¶ 7.[1] Trice was working at that Aldi's as an armed security guard. [55] at 3, ¶ 8. When it was Hudson's turn to purchase her groceries at the register, she thought that the previous customer was in her way. [55] at 3, ¶ 10. The parties disagree about the details, but the general sequence of events has been established. After Hudson began speaking to the other customer, Trice intervened. [55] at 3–4, ¶¶ 10–11, 13. Hudson and Trice then got into an argument. [55] at 5, ¶¶ 14–15. Trice attempted to take the grocery cart from Hudson, and in that moment, she felt a tear in her chest.[2] [17] at 7; [55] at 109–10, 74:22–75:2, 81:18–24. The altercation caused Hudson to call 911. [55] at 9, ¶ 21. Hudson then talked to the on-duty store manager at Aldi's about a surveillance video, Trice's placement of her grocery cart outside, and a refund. [55] at 10–12, ¶¶ 24–28. Eventually Hudson left the store with her groceries and waited in the parking lot for the police to arrive. [55] at 13, ¶ 30. Trice remained inside and did not go out to the parking lot when the police arrived. [55] at 112–13, 87:6–9, 89:10–12, 92:8–13.

---

[1] Bracketed numbers refer to entries on the district court's docket.

[2] Trice finished her shift after midnight and then went to the emergency room. [55] at 119, 115:20–116:23. She was diagnosed with a dissected aorta and sent to a trauma center. [55] at 119, 116:6–7. After a few days in the intensive care unit, Trice left on her own accord and against doctor's wishes. [55] at 120, 120:17–121:13.

An unmarked police car pulled into the Aldi's parking lot; Officer Michael Jones and Officer Fred Taylor spoke with Hudson.[3] [55] at 13, ¶ 31. During her former career as a police officer for the Chicago Police Department, Hudson served as a mentor to both Jones and Taylor; she also dated Jones's father for fifteen years, but that relationship ended many years ago and Jones's father is now deceased. [55] at 13, ¶ 31; *id.* at 190, 47:15–48:2. They explained to Hudson that the police officer who was assigned to take the preliminary report was on his way; they could not take the report because they were only assigned to make warrant arrests. [55] at 13–14, ¶¶ 31, 35. While waiting for the other police officer to arrive, Jones and Taylor allowed Hudson to sit in the back of the police car to stay warm. [55] at 14, ¶ 32.

When the responding officer arrived, Hudson explained to him that she was the victim and that she was a retired police officer. [55] at 15, ¶ 37. In response, the responding officer requested a supervising sergeant to come to the scene. *Id.* The three officers and Hudson continued waiting in the Aldi's parking lot. [55] at 191, 52:2–53:13. Some twenty minutes later, a sergeant arrived on the scene and entered Aldi's. [55] at 15–16, ¶¶ 39–40.[4] While inside Aldi's, the sergeant asked Trice questions for over ten minutes. [55] at 113–14, 93:4–97:23. When the sergeant reappeared in the parking lot, Hudson attempted to tell him what happened, but he

---

[3] The Aldi's Food Market was located in the 3rd Chicago Police District. [55] at 1, ¶ 3. During her career as a police officer, Hudson never worked in that district. *Id.*

[4] According to Hudson, she said hello to the sergeant and he ignored her. [55] at 15–16, ¶¶ 39–40. Trice says that the sergeant talked to Hudson for several minutes in the parking lot before entering Aldi's. *Id.*

3

quickly left the scene. [55] at 16, ¶ 41. The officers also left the scene. [55] at 17, ¶ 42. Neither the sergeant nor any of the officers filled out a police report about the incident, and no one was arrested. [55] at 16–18, ¶¶ 41–42, 46.

When Hudson returned to her home that same evening, she called 311 to make a non-emergency report of the incident at Aldi's. [55] at 18, ¶ 46. The 311 operator transferred Hudson to a police officer to make a report. [55] at 18, ¶ 47. Based on Hudson's description of the events, Officer Frank Doyle created an "Original Case Incident Report," which stated: "In summary, LaDonna Hudson (victim) related to [Officer Doyle] that at above time and location she got into a verbal altercation with J Trice (offender) who works at above location as a security guard. Victim states that offender told her that she better leave the store or she is going to get hurt." [55] at 18–19, ¶ 47; [55] at 214–15.

After the Original Case Incident Report was filed, a Reporting Officer created and approved a "Case Supplementary Report" on December 7, 2012. [55] at 217. This report assigned Trice's case to Detective Lara for further investigation. [55] at 215, 217.

A second Case Supplementary Report was created by another detective on December 11, 2012, and approved two days later. [55] at 219. This report states that the detective conducted a follow-up investigation with Hudson, and she told the detective that while she was at Aldi's, Trice "began to argue with her, snatched her cart full of groceries from her and said 'I wish I could just shoot you.'" [55] at 220.

The report notes that Hudson believed there may be video surveillance of the event and that the detective contacted Aldi's District Manager to retrieve the video. *Id.*

A third Case Supplementary Report was created by Lara on February 8, 2013 and approved three days later. [55] at 226. It explains that Lara and the other detective spoke about the investigation, and that Lara followed up with Aldi's district manager about the video surveillance. [55] at 227–28. The district manager confirmed that he would download the video recording onto a disk, which would be available for Lara to pick up the next day. [55] at 228. A few days later, Lara went to Aldi's and talked to the on-duty store manager. *Id.* The on-duty manager presented Lara with a disk that the district manager had given to him. *Id.* Lara returned to the Area Central Office and unsuccessfully attempted to open the video file on the disk. *Id.* The computer did not have the proper program to open the file, but Lara noted in the report that he would make further attempts to open the file to view the video. *Id.*

During his deposition, Lara gave a more detailed description of the events surrounding the retrieval and viewing of the video. Lara testified that the on-duty manager commented that the video had been reviewed and that the reviewer did not see any type of disturbance or physical altercation. [62] at 33:1–34:15. Lara assumed that the district manager had reviewed it. *Id.* It is unclear whether Lara honored the commitment he made in the report to make further attempts to view the video. Lara did admit, however, that he did not inventory the disk "because [he] felt that it didn't contain any evidentiary value." [62] at 69:12–15. He explained that

in his initial conversation with the district manager, Lara learned that the video did not have audio. [62] at 35:13–17. Thus, in Lara's opinion, a video without sound would not have "made a difference" in his investigation of a verbal assault.[5] [62] at 60:19–23.

A fourth Case Supplementary Report was created by Lara on February 9, 2013, and approved two days later. [55] at 222. This report outlines Lara's conversation with Hudson in which Hudson said Trice approached her and "grabbed her grocery cart and verbally assaulted her by stating, 'I wish I could just shoot you.'" [55] at 224. Hudson told Lara that she wished to sign a criminal complaint against Trice. *Id.* The report also states that Lara went to Aldi's, looking for Trice, but was informed by the on-duty manager that she was not scheduled to work anytime soon due to her workplace injury. [55] at 225. Lara left his business card, and sometime thereafter, Lara received a telephone call from Trice. *Id.* Lara requested to meet with Trice, but she declined. *Id.* Next, the report states that Lara made an appointment to meet Hudson at her home. *Id.* At that appointment, Lara showed Hudson the photo-array that he created and Hudson immediately identified Trice from the five photos. [55] at 224–25. Hudson then signed a complaint against Trice. [55] at 225. Finally, the report stated that Lara issued an investigative alert to arrest Trice with probable cause. *Id.*

---

[5] Words alone are rarely sufficient to constitute an assault; a verbal threat typically requires an accompanying physical gesture to rise to the level of an assault. *See Abbot v. Sangamon Cty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013). Even a silent video that is reported to capture a verbal altercation could have evidentiary value because by watching the actions of the people in the video, the officer could see if a physical gesture was made or not, which would be relevant to determining whether an assault occurred.

6

Lara testified that he determined there was probable cause to arrest Trice after he reviewed the original and supplemental reports, interviewed Hudson, conducted the photo-array that led to Hudson's identification of Trice, and facilitated Hudson's signing of the complaint. [62] at 73:9–16. He also confirmed that it was his understanding that, as a police officer, he may rely on a victim's statement in assessing probable cause. [62] at 78:20–23.

Pursuant to Lara's investigative alert with probable cause, Shalabi received an assignment to arrest Trice. [55] at 41, ¶ 27. Shalabi, with the help of his partner,[6] arranged to meet Trice at a restaurant in Sauk Village, Illinois. *Id.* When Shalabi arrived at the restaurant, Trice was there waiting and Shalabi arrested her. [55] at 41–42, ¶ 28. Shalabi testified that he believed he had probable cause to arrest Trice "[b]ecause there was an investigative alert for her." [55] at 85, 31:12–15.

Trice says that while they were still at the restaurant she showed Shalabi proof from her doctor of her ruptured heart aorta and that she informed him that she needed to take medication to prevent further rupture. [17] at 9. She also says that in the process of Shalabi handcuffing her, he injured her arm. [55] at 141, 203:18–204:22; *id.* at 149, 236:16–18. After arriving at the police station Trice says

---

[6] The identity of Shalabi's partner on the night of Trice's arrest is in dispute. [55] at 41, ¶ 27.

7

that she again requested her medication and to see a doctor, but that her requests were denied. [17] at 9.[7]

A fifth Case Supplementary Report was filed by Lara on February 15, 2013 and approved two days later. [55] at 229. It states that Police Officers Shalabi and Argyropoulos located Trice in Sauk Village and put her under arrest. [55] at 230. It further states that Trice was booked, processed, and charged with assault under 720 ILCS 5/12-1(a). *Id.*

Trice was never convicted of assaulting Hudson; the state eventually dropped its charges against her. [55] at 149, 234:1–9. When she returned from medical leave several months after the incident, she requested to be moved to another Aldi's location because she was afraid that if she continued to work there that she would experience retaliation by Hudson, Lara, or Shalabi. [55] at 117, 106:19–108:11; *id.* at 122, 126:19–127:8. She continues to experience fear and other physical symptoms as a result of the incident and arrest.

From the time of the incident at Aldi's and throughout the subsequent investigation and arrest, Lara and Shalabi were employed by the Chicago Police Department and Hudson was a civilian. [55] at 28, ¶ 1; *id.* at 181, 12:12–14. Previously, though, Hudson worked for the Chicago Police Department (from about May 1990 until about November 2012). [55] at 181, 13:2–8. Prior to this investigation, Lara and Shalabi had never worked together. [55] at 43–44, ¶ 32.

---

[7] Trice's complaint did not allege a claim for excessive force against Shalabi, *see* [17], and her claim for denial of medical attention was dismissed without prejudice, *see* [6]. Trice did not seek to amend her complaint, and so such claims are not before the court.

8

They also did not have any prior contact with Hudson before this investigation, as employees for the Chicago Police Department or as civilians. [55] at 22–23, ¶¶ 52–54.

II. **Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute over a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

III. **Analysis**

A. **False Arrest**

The Fourth Amendment to the United States Constitution prohibits arrests without probable cause. U.S. Const. amend. IV; *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). To prevail on a constitutional claim for false arrest, Trice must show that Lara and Shalabi did not have probable cause to arrest her. *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013). Probable cause exists if the totality of the facts and circumstances at the time of the arrest would prompt a reasonable person to believe that the arrestee had committed a crime. *Abbott*, 705 F.3d at 714. Given this standard, when a police officer obtains information from a victim that establishes the elements of a crime, "the information is almost always sufficient to

9

provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible." *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001).

Additionally, qualified immunity protects government officials from civil liability so long as their conduct does not violate clearly established constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations omitted). Determining whether there was a violation depends on what a reasonable police officer in the defendant's shoes would have understood. *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). In other words, the law does not require perfection from its police officers; qualified immunity protects officers that reasonably but mistakenly believe they have probable cause to arrest. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) (citations omitted).

Trice makes several unsuccessful arguments as to why Lara did not have probable cause to arrest her. First, Trice argues that Lara knew Hudson's complaint did not satisfy the elements of an assault because it did not contain facts about an imminent threat or a physical gesture. Second, Lara knew the sergeant and police officers who were on the scene after the altercation "conducted an investigation and found Defendant Hudson's allegations of assault unfounded and [that] there was no probable cause to arrest Plaintiff on December 6, 2012." [55] at 56. Third, Lara knew that the Original Case Incident Report did not describe an assault and that the subsequent Case Supplementary Reports contained false statements by Hudson

of an assault. Finally, Lara knew that the video of the incident showed that there was no assault, but he nevertheless "destroyed" the video. [55] at 55–56.

Hudson's complaint was not deficient. Under Illinois law, "[a] person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a). Hudson's complaint reads: "[Trice] stated to [Hudson] 'I wish I could just shoot you,' thereby placing […] Hudson in reasonable apprehension of receiving a battery." [52] at 180. The complaint also states that Trice made a physical gesture towards Hudson: "[Trice] knowingly did grab [Hudson]'s grocery cart full of groceries." *Id.* As such, the complaint covered the elements of the crime, and it was reasonable for Lara to consider it and rely on it in his probable cause determination.

There is no admissible evidence in the record that the sergeant or the officers who responded to Aldi's found Hudson's allegation baseless or that they concluded there had been no assault. The record shows that they did not file a police report of the incident, but it does not explain why a report was not created. The parties dispute who the police personnel talked to and for how long while they were on the scene, and the record does not explain what conclusions (if any) they drew. The absence of a police report immediately following an incident, though, does not preclude an officer from determining he has probable cause after further investigation.

While it is true that Hudson's description of the events in the Original Case Incident Report was different from those in the subsequent Case Supplementary

11

Reports, the differences were not so significant as to prevent Lara from determining there was probable cause. Inconsistencies in a victim's story are permissible if a reasonable officer would not find them suspicious. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 744–45 (7th Cir. 2003) (citations omitted). The first report reads: "Victim states that offender told her that she better leave the store or she is going to get hurt." [55] at 215. The next report that includes information from Hudson reads: "The victim […] related to the [detective] that […] an unidentified person began to argue with her, snatched her cart full of groceries from her and said 'I wish I could just shoot you.'" [55] at 220. The second report is more detailed than the first, and unlike the first, the second report includes a quote that Hudson claimed Trice said during the incident. A reasonable officer here might interpret Hudson's developing narrative as a product of a more thorough investigatory interview by the second officer and not a sign of a fabricated story by Hudson. It was reasonable for Lara to consider all of the reports and to not question the veracity of Hudson's statements, especially because Hudson's story remained consistent after the more thorough second report—in the next supplementary report, Hudson again used the "I wish I could shoot you" quotation when telling the reporting officer her story.

Finally, there is no admissible evidence that Lara *knew* that the video showed no evidence of an assault nor is there evidence to support that Lara "destroyed" the video. Lara testified in his deposition that the manager *told him* that the person who reviewed the video did not see a disturbance or physical altercation. Since Lara never watched the video, he could not *know* for certain that

12

the video did not depict an assault; an offhand comment does not change this fact. Lastly, Lara never testified that he "destroyed" the video. He admitted that he did not inventory the video and that it was subsequently lost.

Trice's arguments about Lara's assessment are not supported by admissible evidence; and instead, the evidence establishes that there was probable cause to arrest Trice. Lara found Hudson's information credible and he reasonably relied on her statements, her ability to identify Trice from a photo-array, and her insistence on signing a criminal complaint. "[I]n crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Beauchamp*, 320 F.3d at 743 (citations omitted). Information pertaining to the video did not create enough uncertainty that a reasonable officer in Lara's position would conduct further investigation to confirm the veracity of Hudson's allegations. *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) (citations omitted) ("In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw reasonable inferences based on their training and experience."). Based on the totality of the circumstances, Lara had probable cause to arrest Trice. As such, Trice's false arrest claim against Lara fails as a matter of law.

With respect to Shalabi, he determined he had probable cause to arrest Trice due to the investigative alert Lara issued with probable cause. "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the

direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232–33 (1985)); *see also Banks v. Fuentes*, 545 Fed. App'x 518, 521 (7th Cir. 2013) ("Like a warrant, the investigative alert authorized [plaintiff's] arrest because other officers already had made a determination of probable cause."). Therefore, Shalabi also had probable cause to arrest Trice and he cannot be liable for falsely arresting her.

Even assuming Lara or Shalabi were mistaken in their belief that they had probable cause, they would be protected by the doctrine of qualified immunity since a reasonable officer in their positions would have had the same mistaken belief that probable cause existed given the facts of this case. *See Plumhoff*, 134 S.Ct. at 2023; *Gutierrez*, 722 F.3d at 1008. Consequently, Lara and Shalabi's motion for summary judgment is granted with respect to Trice's false arrest claim against them.

## IV. Conspiracy

To establish liability for conspiracy in a § 1983 claim, the plaintiff must show: (1) the individuals reached an agreement to deprive her of her constitutional rights; and (2) their overt acts in furtherance of the agreement actually deprived her of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Trice's § 1983 conspiracy claim cannot prevail because there is no admissible evidence that

the defendants *agreed* to violate her Fourth Amendment rights or that they took any steps in furtherance of that agreement.[8]

Trice argues that Hudson made false accusations about her; that Hudson conspired with officers to file a complaint against her; and that Hudson conspired with the officers to arrest her. As evidence of the conspiracy, Trice points to: (1) the Original Incident Report, which did not include Trice's alleged statement, "I wish I could just shoot you"; (2) the first Case Supplementary Report, which did not include a description of the events and which was both drafted and approved on the same day by someone who Hudson knew from her time working for the Chicago Police Department; (3) Lara's viewing and destroying of the video; (4) the "questionable" photo-array; and (5) the secrecy of the investigation of Trice, meaning the absence of an official file on Trice or a formal investigation of her case. These assertions are either factually inaccurate or not supported by admissible evidence in the record, or both.

More importantly, Trice's § 1983 conspiracy claim would fail even if she could present admissible evidence to satisfy elements (1) and (2) above. Section 1983 claims are derivative; they can only survive when a plaintiff has been deprived of a constitutional right. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Since Trice's arrest was lawful, she cannot claim that she was deprived of her Fourth Amendment rights; and as a result, her § 1983 conspiracy claim fails too.

---

[8] The record shows that Hudson, Lara, and Shalabi never had any contact with one another prior to this investigation, which undermines an inference that the three individuals would have had a reason to help one another in depriving Trice of her constitutional rights.

15

## V. Conclusion

Lara and Shalabi's motion for summary judgment, [45], is granted. Hudson's motion for summary judgment, [51], is also granted. Enter judgment and terminate civil case.

ENTER:

/s/ Manish S. Shah
Manish S. Shah
United States District Judge

Date: 2/2/2017